***********
Upon review of all of the competent evidence of record with references to the errors assigned and finding good grounds to reconsider the evidence, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case and the parties are properly before the Commission.
2. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
3. Defendant was a duly qualified self-insured, with the Phoenix Fund/National Benefits America acting as its servicing agent on or about May 29, 2000.
4. The employee-employer relationship existed between the parties at all relevant times.
5. Based upon the Form 22, plaintiff's average weekly wage was $598.53 which yields a compensation rate of $399.02 per week.
6. Plaintiff first worked for defendant on April 3, 1995 and is still employed.
7. After the hearing before the Deputy Commissioner, the parties agreed to stipulate into the record the first and second pages of defendant's OSHA 200 logs for the year 2000.
8. The parties stipulated the following into evidence at the hearing before the Deputy Commissioner:
a. Industrial Commission Forms 19, 28B, 18, 33, 33R and 61
b. Job description and videotape depicting the job
c. 126 pages of plaintiff's medical records
 d. Defendant's Supplemental Response to Plaintiff's Interrogatories, First and Second Set
e. Correspondence from defendant to plaintiff
 f. Plaintiff's Response to Defendant's Interrogatories and Request for Production of Documents.
9. The parties stipulated into evidence defendant's employee check history for plaintiff covering the periods of January 7, 2000 through February 1, 2002.
10. The issues for determination by the Commission are:
 a. Whether plaintiff contracted an occupational disease, pursuant to the provisions of the North Carolina Workers' Compensation Act and if so, to what benefits may she be entitled?
 b. Whether plaintiff unjustifiably refused suitable employment and is barred from receiving compensation pursuant to N.C. Gen. Stat. § 97-32?
 ***********
Based upon all of the competent evidence of record the Full Commission make the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was fifty-five years old and right-handed. She worked for defendant for approximately five years beginning on April 3, 1995 through May 29, 2000.
2. Plaintiff worked as an attach skirt sewer, operating a sewing machine to sew skirts on furniture covers. The parties stipulated into evidence a videotape demonstrating plaintiff's job as an attach skirt sewer. The furniture cover skirts were from nine to twelve inches wide and were from three to four feet in length for chairs and five to six feet in length for sofas. Fabric covers varied in weight from two to seven pounds, depending on the type of fabric being sewn.
3. Plaintiff spent approximately eight minutes sewing one sofa skirt. The average weight of a furniture cover was about that of a household blanket or bedspread. Plaintiff rarely lifted weights of up to twenty-five pounds, even though the job description lists that as a possible duty.
4. The videotape depicts plaintiff performing her job duties. Plaintiff agreed that the videotape is an accurate depiction of her job, except that the thread on her machine broke with unusual frequency. Based upon the videotape, it took plaintiff approximately seven and one-half minutes to sew one sofa cover.
5. Plaintiff was required to reach back to her left side to pick-up a cover, lay the cover on the machine, notch the cover for center, lay out the skirt, place it under the needle arm, guide it through the machine, staple a ticket to the cover and then throw the finished product into a bin in front of her. A pneumatically powered cutter slipped the thread and a new cover was inserted. Plaintiff rarely had to pull or tug material through the machine and the sewing machine did not vibrate.
6. Plaintiff worked seven to eight hours per shift, five to six days a week. Her typical shift was from 7:00 a.m. to 4:30 p.m., with a ten-minute morning break, thirty minutes for lunch and a ten-minute afternoon break. Plaintiff sewed approximately 50 to 60 covers per shift.
7. On May 29, 2000, plaintiff went to Hickory Orthopaedic Center where Dr. Mark McGinnis, who had treated a prior hand problem, examined her. Plaintiff did not notify defendant she needed medical care for a work related condition. Plaintiff reported to Dr. McGinnis right hand, wrist, forearm and occasional shoulder pain for two years. She complained of numbness in her right hand, but did not report any left hand symptoms to Dr. McGinnis.
8. Plaintiff returned to Dr. McGinnis on June 13, 2000, at which time he found no muscle atrophy, indicating plaintiff was using her hands normally. Dr. McGinnis released her to return to work without restrictions.
9. Plaintiff returned to work with defendant and continuously worked her regular position. Plaintiff reported hand problems to Mr. Tim Sipes, her supervisor, on August 8, 2000.
10. On March 23, 2001, plaintiff reported left arm symptoms to Dr. McGinnis, in addition to her right-sided symptoms. Dr. McGinnis diagnosed plaintiff with bilateral carpal tunnel syndrome. He performed surgeries to release the right carpal tunnel on March 29, 2001 and the left carpal tunnel on April 26, 2001. Plaintiff's right hand symptoms have almost completely resolved. She continued to experience some left hand symptoms.
11. Despite plaintiff's continued complaints of pain in her left hand and abnormal results of nerve conduction tests on the left hand, Dr. McGinnis released plaintiff to return to work, without restrictions, on July 27, 2001. Defendant specifically modified plaintiff's regular job to eliminate any lifting over 10 pounds. Plaintiff returned to work with defendant on August 6, 2001. Although she has not returned to work with the employer since January 25, 2002, plaintiff is still considered an employee.
12. Dr. McGinnis continued to treat plaintiff through January 31, 2002 for complaints of right arm pain and pain in the fingers on her left hand. Dr. McGinnis did not issue any restrictions and assigned plaintiff 0 % permanent partial impairment rating.
13. Upon review of the job videotape, Dr. McGinnis found that the job was not highly repetitive, even though plaintiff used her hands all day.
14. Dr. McGinnis felt that plaintiff's job placed her at a mild increased risk compared to the general public and that her position may have contributed to or exacerbated the development of carpal tunnel syndrome.
15. On December 13, 2001, plaintiff sought treatment with Dr. Anthony DeFranzo, a plastic and reconstructive surgeon at Wake Forest University Baptist Medical Center who specializes in hand surgery. At the initial visit, Dr. DeFranzo's resident physician examined plaintiff for about ten to fifteen minutes for her complaints of left arm and hand symptoms. It was noted that her right symptoms had resolved post-operatively. Plaintiff received a Kenalog injection in the left carpal tunnel at that time.
16. Plaintiff returned to Dr. DeFranzo on January 24, 2002, at which time she reported no significant improvement to the left hand. Dr. DeFranzo found plaintiff's right hand to be at maximum medical improvement and assigned her an 11 % permanent partial impairment rating under the American Medical Association (AMA) Guidelines. Dr. De Franzo believed the AMA standard is the best standard, but also took into consideration the North Carolina rating guidelines. Dr. DeFranzo did not feel carpal tunnel is just a wrist problem and also gave plaintiff a 10 % permanent partial disability rating to plaintiff's right upper extremity.
17. Dr. DeFranzo stated that plaintiff's left hand required further treatment including another nerve conduction study and ultrasound of the carpal tunnel in motion. Defendant did not authorize this additional testing. Although plaintiff's left hand was not at maximum medical improvement, Dr. DeFranzo assigned a 17 % permanent partial impairment rating to plaintiff's left hand under the AMA Guidelines and a 15 % permanent partial disability rating to plaintiff's left upper extremity.
18. Dr. DeFranzo assigned permanent work restrictions of light duty, non-repetitive work with a twenty pound lifting restriction when lifting with both hands. On January 28, 2002, defendant sent a letter to plaintiff advising that they could accommodate her restrictions. However, on February 12, 2002, after receiving further information from Dr. DeFranzo concerning her restrictions, defendant was unable to accommodate her light duty restrictions and plaintiff did not work for defendant after January 25, 2002.
19. After reviewing the videotape of plaintiff performing the attach skirt job, Dr. DeFranzo stated that plaintiff's job was highly repetitive and could have caused plaintiff's carpal tunnel syndrome. He testified plaintiff's job required more than 2,000 hand motions per hour and stated the motions he observed were the worst kind for developing carpal tunnel syndrome. Dr. DeFranzo stated he did not actually count the hand motions but based his opinion on his experience treating hundreds of carpal tunnel patients each year.
20. Dr. DeFranzo testified plaintiff was "without question" exposed to a greater risk of developing carpal tunnel syndrome through her employment than members of the general public.
21. Dr. DeFranzo did not feel that plaintiff could return to her position as a sewer.
22. At the request of the servicing agent, Dr. Warren Burrows, a hand surgeon at Carolina Hand Center, reviewed Dr. McGinnis' medical records and plaintiff's job videotape. Dr. Burrows did not examine plaintiff.
23. Dr. Burrows counted each type of movement and calculated the number of movements per hour. He noted four threads broke during the video, plaintiff pushed 350 times per hour, turned 248 times per hour and stapled 8 times per hour, for a total of total of 606 movements per hour. However, Dr. Burrows counted stapling as one movement, instead of the actual movement of the hand required for each activity.
24. Based upon his observations in the job videotape, Dr. Burrows felt plaintiff's job was neither highly repetitive nor a significant contributing factor in the development of her carpal tunnel syndrome.
25. The Full Commission gives greater weight to the testimony of Dr. McGinnis and Dr. DeFranzo, the treating physicians, than to the opinions of Dr. Burrows.
26. The Full Commission finds the greater weight of competent credible evidence in the record supports a finding that plaintiff's employment was a significant contributing factor in the development of plaintiff's carpal tunnel syndrome.
27. As the result of plaintiff's repetitive use of her hands in her work with defendant, plaintiff contracted carpal tunnel syndrome. Plaintiff's employment with defendants placed her at an increased risk of contracting the disease as compared to members of the general public not so employed.
28. As the result of plaintiff's bilateral carpal tunnel syndrome, plaintiff was disabled and was unable to earn wages in her regular employment or any employment for the periods March 23, 2001 through July 27, 2001 and January 25, 2002 and continuing.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's bilateral carpal tunnel syndrome was caused by and due to causes and conditions characteristic of and peculiar to plaintiff's employment with defendant. Plaintiff's bilateral carpal tunnel syndrome is not an ordinary disease of life to which the general public not so employed is equally exposed and is, therefore, an occupational disease. N.C. Gen. Stat. § 97-53(13); Booker v. Medical Center, 297 N.C. 458,256 S.E.2d 189 (1979).
2. As a result of her contraction of a compensable occupational disease, plaintiff was incapable of earning wages which she was receiving at the time of the contraction of her occupational disease in the same or in any other employment and is entitled to temporary total disability at the rate of $399.02 per week for the period beginning March 23, 2001 through and including July 27, 2001 and from January 25, 2002 until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. As a direct and proximate result of plaintiff's compensable occupational disease, plaintiff retains a 17 % permanent partial disability to her left hand and 11 % to her right hand. N.C. Gen. Stat. § 97-31(12).
4. Plaintiff is entitled to have defendant provide all medical treatment arising from her occupational disease to the extent it tends to effect a cure, give relief or lessen the period of disability. N.C. Gen. Stat. §§ 97-25, 97-25.1.
5. Plaintiff did not refuse suitable employment under N.C. Gen. Stat. § 97-32.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay temporary total disability compensation to plaintiff at the rate of $399.02 per week for the period beginning March 23, 2001 through and including July 27, 2001 and from January 25, 2000 and continuing until plaintiff returns to work or until further order of the Commission. Portions of this amount have accrued and shall be paid in a lump sum, subject to the attorney's fee approved below.
2. A reasonable attorney's fee of 25 % of the compensation due plaintiff under Paragraph 1 of the Award is approved for plaintiff's counsel and shall be deducted from that sum and paid directly to plaintiff's counsel.
3. Defendant shall pay for all related medical expenses that are reasonably necessary to effect a cure, give relief or lessen the period of plaintiff's disability.
4. Defendant shall bear the costs.
This ___ day of May 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
LKM/kjd